IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
BRENDA JOYCE LOWERY ,          *
                               *
         Plaintiff,            *
                               *
    v.                         *          CV 106-90
                               *
RONALD STRENGTH, Sheriff;      *
GENE JOHNSON, Captain;         *
KEN RODGERS, Investigator,     *
                               *
         Defendants.           *
```

————————

O R D E R

————————

Plaintiff Brenda Joyce Lowery filed the captioned case alleging various claims arising from her termination by the Richmond County Sheriff's Office on July 19, 2004. Plaintiff originally brought this action pro se, and after various amended complaints, this Court authorized three counts to proceed: interference with Plaintiff's rights under the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1) ("FMLA"); wrongful termination in violation of Plaintiff's procedural due process rights; and a First Amendment retaliatory discharge claim. (See Doc. nos. 44 and 62.) Plaintiff has since abandoned her retaliatory discharge claim against all defendants and has also

abandoned her remaining claims against Gene Johnson and Ken Rodgers. (See Doc. no. 104.)   Thus, Plaintiff's retaliatory discharge claim is **DISMISSED** and Defendants Rodgers and Johnson are **DISMISSED** from this case.

This matter now comes before the Court pursuant to the parties' cross Motions for Summary Judgment under Federal Rule of Civil Procedure 56(c). (Docs. no. 69 & 87.) Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Defendant Ronald Strength's motion (Doc. No. 87) is **GRANTED** for the reasons stated below. Plaintiff's motion (Doc. no. 69) is **DENIED.**

## I.   BACKGROUND

### A.   Plaintiff's Work History

Plaintiff's FMLA and procedural due process claims arise from the events surrounding her termination with the Richmond County Sheriff's Office ("RCSO").   Plaintiff became employed with RCSO in February of 2003 as a deputy jailer. (Pl. Dep. at 20.) At some point during 2004, Plaintiff suffered a "nervous breakdown" while she was working with RCSO. (Id. at 21.) Plaintiff contends that this breakdown was precipitated by witnessing an inmate hang himself in his cell. (Id. at 72-74.) On June 6, 2004, Plaintiff went to visit her physician, Dr. Audrey M.

Henderson. (Id. at 77.) Dr. Henderson provided medical care from June 6 to June 13, 2004 for Plaintiff's anxiety and depression caused by work-related stress.  (Id.) Because of her mental instability, Plaintiff was then excused from her job by Dr. Henderson from June 15 to June 29, 2004. (Pl. Dep. Ex. 1.)

Pursuant to her doctor's instruction, Plaintiff returned to work on June 30, 2004.  Plaintiff worked on both June 30 and July 1.  Plaintiff was scheduled to work again on July 5.  However, after four hours of work on the fifth, Plaintiff's supervisor, Lt. Howard, sent her home because she was crying uncontrollably.  (Aff. of Pl. ¶ 5.) Lt. Howard told her to take as much time as she needed to correct her medical condition. (Id.)

Plaintiff contends that she was still on medical leave under the FMLA at this time. (Id. at 25-26.) Plaintiff presents evidence of a "Certificate to Return to Work/School" written by Dr. Henderson, stating that "Brenda Lowery has been under my care from 7/6/04 to 9/13/04." The certificate states that the absence is due to "medical reasons" but does not list a date that Plaintiff would be approved to be return to work.  (Pl. Dep. Ex. 6.) Plaintiff says that Lt. Howard directed her to provide statements from her doctor to "Tonya" and Mary Wells in

3

jail administration to approve her leave. (Aff. of Pl. ¶ 7.) RCSO has no record of Plaintiff ever applying for medical leave or receiving such leave. (Aff. of Reid ¶ 7.)

**B.  The July 10, 2004 Incident at Chuck E. Cheese**

On the evening of July 10, 2004, Plaintiff went to Chuck E. Cheese Pizza restaurant in Augusta for a family outing with her husband, children, two neighbors, her niece, LaKeisha Scott, and Scott's son. (Dep. of Pl. at 27.) At some point, Plaintiff began to feel ill and left the restaurant to go lie down at a relative's house. (Id. at 29-30.) While she was resting, Plaintiff received a phone call from Scott who was still at the restaurant. (Id. at 31.) Scott told her that an altercation had occurred between her and another woman, identified later as Angela Harmon, concerning their children. (Id. at 31-32.) According to Plaintiff, the children had fought over one of the video games. (Id.) Plaintiff contends she could hear Harmon cussing over the phone. Plaintiff told Scott that she would call the police, and she returned to Chuck E. Cheese. Plaintiff called RCSO dispatch and informed them of the dispute. (Id.)

Both parties dispute what next happened at the restaurant. Plaintiff contends that when she arrived, she approached Harmon to discuss the fight between Harmon and

4

Scott. (Id. at 34.)  Plaintiff contends that Harmon pushed her in the chest and she defended herself by striking Harmon in the face. (Id. at 35.)  Plaintiff also contends that she was "double teamed" when Harmon's boyfriend joined in the attack and began pulling Plaintiff's hair. (Id.) Scott, both of Plaintiff's children, and Chase Cochran, Plaintiff's neighbor, corroborate Plaintiff's version of events, alleging that Harmon struck Plaintiff first and Plaintiff reacted in self defense by striking her in the face. (Aff. of Daniel K. Rogers, Jr., Ex. A.)

On the other hand, Harmon alleges that Plaintiff arrived at the restaurant yelling "[w]hich one is it, which one is it?". (Id. (Statement of Harmon).) Scott pointed out Harmon to Plaintiff and Plaintiff approached her, asking "What is the . . . problem?" and putting her hands in Harmon's face. (Id.) Harmon told her to remove her hands, at which point Plaintiff struck Harmon in the face. (Id.) Harmon began defending herself and Plaintiff stated, "You are going to jail and once we get you down to the jail we are going to beat your . . ." (Id.)  Harmon received scratches upon her face, which were witnessed by Sergeant Steptoe, one of the officers at the scene. (Id.)

Harmon's account is confirmed by three disinterested witnesses.  Cheryl Walker, a Chuck E. Cheese employee,

notes that Plaintiff got in Harmon's face and hit her first. (Id. (Statement of Walker).)   Tim Updegrove, the manager, also stated that he witnessed the altercation between the women and that Plaintiff hit Harmon first. (Id. (Statement of Updegrove).)   Connie Allen, another employee, stated that Plaintiff, who identified herself as a police officer, "attacked the other lady." (Id. (Statement of Allen).)   These employees also indicated that Plaintiff threatened them after learning that they were giving unfavorable statements about the incident to the deputies. (Aff. of Rogers ¶ 6.)   Plaintiff contends that these employees are lying.  (Pl. Dep. at 46-47, 83.)

As a result of Plaintiff's phone call to police that evening, officers of the RCSO were present at the scene. Sergeant Steptoe as well as Deputies Kuhlke and Trapp responded to the call. (Aff. of Rogers, Ex. A; Pl. Dep. at 39-40.)   Because the altercation had involved a Richmond County deputy, Investigator Daniel Rogers was assigned to conduct an investigation into the incident. (Aff. of Rogers ¶ 3.)   Inv. Rogers was provided with an incident report prepared by the officers who responded to the call on the night of July 10. (Id.; Pl. Dep. at 39-40.) Inv. Rogers completed an investigative file on the incident which included the incident report as well as witness interviews

from Plaintiff, Harmon, employees of Chuck E. Cheese, and several of Plaintiff's family members.

Based upon his investigation, Inv. Rogers determined that there was probable cause for a warrant to be issued against Plaintiff for simple battery and applied for such a warrant.  (Aff. of Rogers ¶ 7.)  Plaintiff was placed under arrest on July 14, 2004. (<u>Id.</u>)

### C.   RCSO's Internal Investigation and Plaintiff's Subsequent Termination

According to RCSO policy, an officer is subject to termination for engaging in criminal acts or for violation of the "Manner of Conduct" provisions of the Rules and Regulations established by the RCSO. (Aff. of Strength ¶ 5; Aff. of Young, Ex. E at 3.) When a violation of the regulations occurs, the Internal Affairs Division of the RCSO conducts an investigation. Sergeant Pat Young was the Internal Affairs Investigator involved in the investigation of Plaintiff's arrest. (Aff. of Young ¶ 3.)

Sgt. Young first met with Plaintiff on July 12, 2004, the Monday following the incident. Plaintiff provided Sgt. Young with statements by her family members regarding the incident of July 10, 2004. (<u>Id</u>. ¶ 4.) Plaintiff also provided Sgt. Young with her account of the incident. (<u>Id.</u>)

Subsequently, Inv. Rogers told Sgt. Young that Plaintiff had been charged with simple battery and would be coming to the Sheriff's Office to be arrested on July 14, 2004. (Id.)   Plaintiff reported for arrest at 2:00 p.m. that afternoon. (Pl. Dep. at 60.)   When Plaintiff arrived for her arrest, Sgt. Young informed her that the disciplinary review board would meet the following day at 9:30 a.m. to consider her involvement in the Chuck E. Cheese incident. (Aff. of Young ¶ 6.) Plaintiff was provided with written notice, informing her that she could "present any evidence, testimony, or witnesses . . . on her behalf." (Id. Ex. A.) Plaintiff alleges that she did not have time to secure a lawyer before the board meeting the next day.

The meeting of the disciplinary review board took place the next morning at the scheduled time.   Inv. Rogers did not testify in front of the board. (Id. ¶ 8.) However, Sgt. Young presented Rogers' entire investigatory file. The board also reviewed the incident report as well as statements from Harmon, Plaintiff's family members, and the Chuck E. Cheese employees.  (Id. Ex. B.)

Plaintiff was provided with the opportunity to present witnesses on her own behalf. Specifically, her husband, Dalton Lowery, testified about how much her job as a deputy

8

meant to her. (Id.)   Plaintiff presented character letters
from a family friend and her apartment complex manager.
(Id.)   Plaintiff then had the opportunity to explain her
version of the facts as to what happened at Chuck E.
Cheese.   At deposition, Plaintiff claims that she was on
"so much medication that her husband had to talk for her."
(Pl. Dep. at 66.) However, the review board record details
the elaborate testimony of Plaintiff, explaining her side
of the story.  (Aff. of Young, Ex. B.)

At the conclusion of the hearing, the review board
found Plaintiff in violation of the Rules and Regulations
of the Sheriff's Office, namely, the provisions on Manner
of Conduct and Criminal Acts, and recommended that she be
terminated. (Id.) This recommendation was not unusual. From
the time Ronald Strength took office as Richmond County
Sheriff in 2001 until the end of 2004, twenty-five officers
were disciplined on charges involving criminal acts. (Aff.
of Strength ¶ 8, Ex. A.)  Of these twenty-five individuals,
all but two resulted in termination or the officer's
resignation. (Id.)   In fact, seven officers were charged
with simple battery, and each of these officers was
terminated or resigned prior to the meeting of the
disciplinary board. (Id.)

On July 19, 2004 Sgt. Young met with Plaintiff and explained that she was being terminated for violations of the RCSO Regulations. (Aff. of Young ¶ 11.) Sgt. Young provided her with the report from the disciplinary board and a notice of her appeal rights. (<u>Id.</u>)   Indeed, an employee has the right to appeal her termination to a Sheriff's Office Merit Board made up of private citizens. (Aff. of Strength ¶ 9.) Plaintiff contends that she never received notice of her appeal rights. (Aff. of Pl. ¶ 10.) However, the RCSO Policy and Procedures Manual states that "[a]ny permanent employee who is dismissed, demoted or suspended shall have the right to appeal the action to the Richmond County Sheriff's Merit Board." (Aff. of Young, Ex. D at 3.)   Plaintiff did not exercise her right to appeal.


## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when there are no genuine issues of fact and the movant is entitled to summary judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).   In considering a motion for summary

judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. <u>Hogan v. Allstote Ins. Co.</u>, 361 F.3d 621, 625 (11th Cir. 2004). The party opposed to the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Walker v. Darby</u>, 911 F.2d 1573, 1576-77 (11th Cir. 1990). Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In response to Defendants' Motion for Summary Judgment, the Clerk issued a <u>Griffith</u>[1] notice on August 5, 2008. (Doc. no. 98.)

### III. <u>DISCUSSION</u>

#### A.    Interference with the Family Medical Leave Act

Plaintiff's first claim is couched as a "Violation of Family Medical Leave Act of 1993." (Doc. no. 36.) The FMLA provides that an eligible employee is entitled to a maximum of twelve weeks of leave during which her employment status is protected because of a serious health

---

[1] <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam).

condition that makes her unable to perform the functions of her employment. Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1204 (11th Cir. 2001). The FMLA provides for two types of claims: interference and retaliation. 29 U.S.C. §§ 2601-2654; see Russell v. North Broward Hosp., 346 F.3d 1335, 1340 (11th Cir. 2003). Plaintiff does not specify the nature of the supposed FMLA violation in her complaint. However, in her objections to the Magistrate Judge's Report and Recommendation, Plaintiff "objects on the grounds that the [Richmond County Sheriff's Office] did in fact interfere with the plaintiff's FML." (Doc. no. 47 at 13) (emphasis added). Thus, this Court, in its adoption of the Magistrate's Report and Recommendation, construed Plaintiff's claim under the FMLA as an interference claim and allowed the claim to proceed. (Doc. no. 62.)

An FMLA interference claim involves an employer denying or otherwise interfering with an employee's substantive rights under the FMLA. See 29 U.S.C. § 2615(a)(1). In order to prevail on her interference claim at trial, Plaintiff must "'demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting Strickland,

239 F.3d at 1207). Thus, Plaintiff must first prove that she was entitled to FMLA leave.  According to Plaintiff, at the time of her termination, she had been on approved medical disability leave from July 6, 2004 to September 13, 2004. [2] (Pl. Dep. Ex. 6.)

Next, Plaintiff must demonstrate that the Defendant denied or interfered with her FMLA rights. Plaintiff seems to allege that RCSO interfered with her FMLA rights in two ways: first, by requiring her to appear for the disciplinary review board while she was on leave (see doc. no. 47 at 13); and second, by "using the alleged simple battery incident to develop a reason to terminate Plaintiff so that Plaintiff would not benefit from the provisions of the FMLA." (Pl. Br. at 5.) The Court will address each of these arguments in turn.

---

[2] The Court notes that the evidence is sparse that Plaintiff had applied for or was granted FMLA leave at the time of her termination. In support of this allegation, Plaintiff has produced various documents from Dr. Henderson. The first note excuses her from work from June 15 to June 29, 2004, clearing her to return to work on June 30, almost two weeks before the incident took place. (Pl. Dep. Ex. 1.) Plaintiff also produces a note from Dr. Henderson dated July 14, 2004, verifying that Plaintiff has been under her care since May 2004 for depression and anxiety. (Pl. Dep. Ex. 4.) Finally, Plaintiff produces a "Certificate to Return to School/Work" that states "Brenda Lowery has been under my care from 7/6/2004 to 9/13/04" but does not provide a date for which Plaintiff is eligible to return to work.  (Pl. Dep. Ex. 6.)  The RCSO, however, has no record of Plaintiff ever requesting leave under the FMLA. Because this Court is bound to construe the facts in the light most favorable to the Plaintiff, the Court will assume that Plaintiff was on FMLA leave at the time of the disciplinary review board and subsequent termination.

### i. Requiring Plaintiff to Attend the
### Disciplinary Review Board Hearing

The FMLA does not define the term "interference." The Department of Labor regulations indicate that "interfering with" an employee's FMLA rights includes refusing to authorize FMLA leave, discouraging an employee from using such leave, and manipulation by an employer to avoid responsibilities under FMLA. 29 C.F.R. § 825.220(b). The Eleventh Circuit has not described those employer actions that qualify as interference. Thus, the Court looks to other circuits to determine whether simply requiring Plaintiff to attend a disciplinary review hearing is interference under the FMLA.

The Eighth Circuit, for example, holds that the FMLA prohibits employer activities that "deter" employees' participation in activities protected by the FMLA. Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006). Likewise, the Ninth Circuit has held that the FMLA's anti-interference provision bars conduct that "tends to chill an employee's willingness to exercise his [FMLA] rights." Bachelor v. Am. West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001). The District of Kansas held that "if an employer provides a powerful disincentive for taking FMLA leave, it constitutes interference." Coleman v.

Blue Cross Blue Shield of Kan., 487 F. Supp. 2d 1225, 1247 (D. Kan. 2007). Finally, the District of Arizona has required that in order to succeed on an FMLA interference claim, a plaintiff must demonstrate that he or she suffered an adverse employment action causally related to taking FMLA leave. Foraker v. Apollo Group, Inc., 427 F. Supp. 2d 936, 942 (D. Ariz. 2006) (noting that only "non-trivial" employment actions that would deter reasonable employees are actionable).

The disciplinary review board convened solely to address Plaintiff's actions at Chuck E. Cheese on July 10, 2004. Though this incident occurred while Plaintiff was allegedly on FMLA leave, no issues regarding her leave were discussed at the hearing. Indeed, RCSO had no record that Plaintiff was even on leave at the time of her termination. The hearing was wholly unrelated to her rights under the FMLA.

This Court is unwilling to hold that requiring Plaintiff to attend a disciplinary review hearing that was not only unrelated to her FMLA benefits, but, according to Plaintiff, lasted no more than fifteen minutes, qualifies as interference with her rights under the FMLA. Defendant, as an employer of the state of Georgia, was required to provide her with notice and hearing before terminating her

15

employment.  See Cleveland Bd. of Educ. v. Loudermill, 470
U.S. 532, 546 (1985).  Defendant, by asking Plaintiff to
appear to provide her an opportunity to address the charges
against her, did not deter nor chill her willingness to
exercise her rights under the FMLA.  The Defendant did not
commit a violation of FMLA by satisfying its due process
obligation to Plaintiff.

### ii. Terminating Plaintiff to Prevent her from Receiving the Benefits of the FMLA

Next, the Court considers Plaintiff's argument that
Defendant interfered with her FMLA rights by terminating
her so she would not receive the benefits entitled to her.
In O'Connor v. PCA Family Health Plan, 200 F.3d 1349, 1354
(11th Cir. 2000), the Eleventh Circuit established that an
employee on FMLA leave has no greater right to benefits or
conditions of employment than if the employee had been
continuously employed during the FMLA leave period.  In
O'Connor, the plaintiff had chosen to take FMLA leave for
the birth of her child.  Id. at 1351.  While the plaintiff
was on leave, the defendant employer chose to terminate her
employment as part of a reduction in force caused by
economic loss.  Id.  The plaintiff brought suit under the
FMLA, alleging that because she was entitled to be

reinstated after her leave, yet was denied that benefit by her termination, her employer had violated the FMLA.

The Eleventh Circuit disagreed. The court explained that "when an eligible employee who was on FMLA leave alleges her employer denied her the FMLA right to reinstatement, the employer has an opportunity to demonstrate that it would have discharged the employee even had she not been on FMLA." Id. at 1354. The court went on to explain that the district court had determined that the defendant terminated the plaintiff as part of the reduction of force, not because she took FMLA leave. Id. The Eleventh Circuit found no reason to dispute that finding, and thus, summary judgment was affirmed. Id.; see also Strickland, 239 F.3d at 1208 ("[I]f an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable."); Martin v. Brevard County Pub. Schs., 543 F.3d 1261, 1267 (11th Cir. 2008).

In the same way, the evidence is overwhelming that Plaintiff was terminated because of the altercation at Chuck E. Cheese, and not because she was on FMLA leave. Plaintiff was arrested for simple battery as a result of the events of July 10, 2004. After the hearing to evaluate the incident, the disciplinary review board recommended

17

termination.   There is no indication that the board members even knew she was on FMLA leave at the time.

Sheriff Strength testified that since he took office as Sheriff in January of 2001, twenty-five officers have been subject to disciplinary proceedings for charges involving criminal acts.   Of those twenty-five, only two did not result in termination or the officer's resignation. Sheriff Strength testified that based on the investigation into Plaintiff's behavior at Chuck E. Cheese, "there was no other option other than terminate [Plaintiff]." (Aff. of Strength ¶ 11.)

Plaintiff, in fact, admits that a violation of Georgia criminal statutes would provide an "independent reason for termination and would preclude FMLA protection." (Pl. Br. at 5.) It is Plaintiff's contention, however, that RCSO "develop[ed] a reason to terminate Plaintiff so that Plaintiff would not benefit from the provisions of FMLA." (Id.)   Yet Plaintiff has not presented a scintilla of evidence to demonstrate that the RSCO used the disciplinary hearing to fabricate a reason for terminating her to prevent her from exercising her rights under the FMLA. Such a conclusory allegation is not evidence which survives

18

Defendant's Motion for Summary Judgment.  Thus, summary judgment is properly granted. [3]

## B.   Procedural Due Process Claim[4]

Plaintiff next argues that she was wrongfully terminated by the RSCO without proper due process. Plaintiff's argument is without merit.  The Supreme Court has established that public employees have a property interest in continued employment.  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985). In the <u>Cleveland</u> case, the Court set forth the procedural due process requirements that a public employee is entitled to before being terminated, namely, notice and an opportunity to respond.  <u>Cleveland</u>, 470 U.S. at 546.

---

[3] It is worth noting that Plaintiff's allegation could also be classified as a FMLA retaliation claim.  Even if Plaintiff's claim was construed as such a claim, it would still fail. A FMLA retaliation claim is subject to the <u>McDonnell Douglas</u> burden-shifting framework applied in Title VII cases. <u>Drago v. Jenne</u>, 453 F.3d 1301, 1307 (11th Cir. 2006). In order to establish a prima face case for retaliation, the plaintiff must show: 1) she engaged in statutorily protected conduct, 2) she was adversely affected by an employment decision; and 3) there is a causal connection between the statutorily protected conduct and the adverse employment action. <u>Id.</u>  Upon satisfying that burden, the burden then shifts to the defendant to articulate a non retaliatory decision for its actions. Here, even if this Court were to find that Plaintiff had satisfied the prima facie case for retaliation, Defendant has provided a legitimate non retaliatory basis for its actions: Plaintiff's arrest for simple battery.  Plaintiff has not provided any evidence to demonstrate Defendant's articulated reason is pretextual. Thus, summary judgment is still proper, even as to a retaliation claim.

[4] Plaintiff couches this claim as a "breach of contract/wrongful termination claim," but the substance of this claim concerns her right to due process as a state employee with a property interest in continued employment.

The Court recognized in <u>Cleveland</u> the need for some form of pre-termination hearing prior to adverse administrative action.  Specifically, the Court held that a pre-termination 'hearing' is necessary, but it need not be elaborate.  <u>Id.</u> at 546.  In general, the Court explained "'something less' than a full evidentiary hearing is sufficient prior to adverse administration action."  <u>Id.</u> (citing <u>Matthews v. Eldridge</u>, 424 U.S. 319, 343 (1976)). The Court instructed that "the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  <u>Id.</u>

In light of the Supreme Court's precedent, the Eleventh Circuit has provided district courts guidance in determining what process meets the standard set forth in <u>Cleveland</u>.  In <u>McKinney v. Pate</u>, 20 F.3d 1550, 1561-62 (11th Cir. 1994), the court found that the public employee received all the process he was due under <u>Cleveland</u> when he received written notice of the charges against him, had the opportunity to hear an explanation of the Board's evidence at a hearing, and had the opportunity to present his side of the story through witnesses, evidence and argument.

In <u>Marshall v. City of Cape Coral, Fla.</u>, 797 F.2d 1555 (11th Cir. 1986), the court found no procedural or

substantive due process violations and affirmed summary judgment for the defendants. In that case, the plaintiff's pre-termination process consisted of a ten to fifteen minute meeting with his supervisor where plaintiff was given a letter detailing his performance deficiencies and told he was fired, effective in three days. Id. at 1557; see also Betts v. City of Edgewater, 646 F. Supp. 1427, 1439 (M.D. Fla. 1986)(concluding that the plaintiff had sufficient notice and opportunity to respond under Cleveland when he received 24 hour notice that a special council meeting was to convene to determine whether he would be placed on probation, and instructed to prepare his response).

Based upon this case law, the process provided to Plaintiff conforms to the Court's instruction in Cleveland. Plaintiff was provided oral and written notice that she was to appear before the Disciplinary Review Board to discuss the events of July 10, 2004. Sgt. Young presented the evidence against her collected by Inv. Rogers. More importantly, Plaintiff was given the opportunity to present her case. She provided character reference letters. Her husband spoke on her behalf. Plaintiff testified as to her recollection of the incident at Chuck E. Cheese. Finally, after her termination, she was provided the opportunity to

appeal to the Richmond County Merit Board, though she did not exercise this right.

Plaintiff finds a litany of reasons that her due process was inadequate. She contends that she was not provided the opportunity to cross examine witnesses, that she was heavily medicated, and that she did not have time to find a lawyer to assist her. Plaintiff refers to the proceeding as a "kangaroo court." (Pl. Br. at 8.)

Plaintiff mistakes the objective of this proceeding. Plaintiff was not being tried on the charge of simple battery. A pre-termination hearing "serve[s] the limited purpose of ensuring that the employer does not act upon *ex parte* charges without some opportunity for the employee to respond to those charges." Burch v. Rame, 676 F. Supp. 1218, 1227 (S.D. Ga. 1988). The opportunity to be heard at a pre-termination hearing need not encompass the elements of an adversary proceeding. Id. "An opportunity to respond orally to the charges before any action is taken, coupled with a more formalistic post-termination hearing, provides the employee with due process." Id. Here, although not afforded all the due process she would have upon a trial on a criminal charge, Plaintiff was given notice and an opportunity to respond to the charges against her before her termination. Such opportunity, coupled with

22

the availability of a post-termination appeals process, satisfies procedural due process.

Plaintiff also argues that the RCSO investigators did not conduct a proper investigation by ignoring the conflicting testimony from other witnesses. She suggests that while probable cause may have existed to arrest her, probable cause is not sufficient to effect her termination. This Court will only inquire as to whether Plaintiff was provided sufficient due process before her termination. It is not the duty of this Court to evaluate the correctness of the decision of the Sheriff. See Bishop v. Wood, 426 U.S. 341, 349-350 (1976) ("The federal court is [not] the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."). The Court is satisfied that procedural due process was provided; thus, its inquiry ends.[5]

## C.  Plaintiff's Other Motions

This Court must finally address Plaintiff's motions that remain on the docket. On December 14, 2007, Plaintiff made a Motion for Default Judgment as to Defendants Sidney Hatfield, Ken Rodgers, and Gene Johnson. On January 4,

---

[5] Plaintiff also appears to argue that Defendant has committed a substantive due process violation against her. (See Pl. Br. at 7.) Plaintiff did not allege a substantive due process violation in her second amended complaint and this Court did not authorize Plaintiff to proceed on a substantive due process claim. (See Doc. no. 62.) Thus, this Court will not consider such a claim.

2008, this Court dismissed Defendant Hatfield from the case. (Doc. no. 62.) Pursuant to Plaintiff's motion, Defendants Rodgers and Johnson have also been dismissed from the case. Thus, Plaintiff's motion for default judgment (doc. no. 59) is **DENIED AS MOOT.**

On January 16, 2008, Plaintiff moved to join the Richmond County Board of Commissioners under a theory of *respondeat superior*, alleging that the Richmond County Board of Commissioners is liable because of the actions taken by Sheriff Strength and Investigators Rodgers and Johnson. However, it is well settled that a municipality cannot be held liable based on a theory of *respondeat superior*. See City of Canton v. Harris, 489 U.S. 378, 385 (1989); Monell v. Dept. of Social Servs., 436 U.S. 658, 663 (U.S. 1978). Further, this Court has determined that no underlying constitutional violation occurred. Thus, Plaintiff's Motion for Joinder (doc. no. 63) is **DENIED.**

## IV. CONCLUSION

Upon the foregoing, Defendants' Motion for Summary Judgment (doc. no. 87) is **GRANTED.** Plaintiff's "Motion for Immediate Judgment Formalized as a Summary Judgment" (doc. No. 69) is therefore **DENIED.** The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants. The Clerk

shall terminate all deadlines and motions, and **CLOSE** the case.

ORDER ENTERED at Augusta, Georgia, this 4th day of March, 2009.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE